# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JOEL CIELAK and BARRON HODGES,<br><br>              Plaintiffs,<br><br>v.<br><br>NICOLET UNIFIED SCHOOL DISTRICT, NICOLET HIGH SCHOOL, GERALD T. HAIG, MYRA TAXMAN, ROBERT STRAUSS, and JOHN DOES 1–100,<br><br>              Defendants. | Case No. 22-CV-819-JPS<br><br><br>**ORDER** |

## 1.    INTRODUCTION

On July 18, 2022, Joel Cielak ("Cielak") and Barron Hodges ("Hodges") (together, "Plaintiffs") filed a complaint in the above-captioned matter. ECF No. 1. While they were students at Nicolet High School ("NHS") in the early 1980s, Plaintiffs were sexually abused by the now-deceased NHS teacher David Johnson ("Johnson"). *Id.* at 4. Plaintiffs allege that Defendants NHS, the Nicolet Unified School District (the "School District"),[1] members of the School District board during the 1980s, and John Doe employees of NHS and the School District knew or should have known about those instances of abuse, but improperly responded to them,  which

---

[1] The official name of the School District is the Nicolet Union High School District. *See* National Center for Education Statistics, perma.cc/6Y7E-KSX8 (last visited Sept. 27, 2023). NHS is the only school in the School District. *See id.* The NHS website uses the name "Nicolet Union High School." *See* Nicolet Union High School, https://www.nicolet.k12.wi.us/ (last visited Sept. 27, 2023).

caused Plaintiffs psychological harm and violated Plaintiffs' civil and constitutional rights. *See generally id.*

Remaining[2] Defendants NHS, the School District, Gerald T. Haig ("Haig"), Myra Taxman ("Taxman"), and Robert Strauss ("Strauss") (collectively for purposes of this motion, the "Moving Defendants") moved to dismiss the complaint. ECF No. 11. That motion is fully briefed, ECF Nos. 12, 22, 29, although the Court notes that many of Plaintiffs' arguments in opposition to dismissal are—to borrow a phrase of which Plaintiffs' counsel is already aware—"underdeveloped to the point of waiver." *Bonchek v. Nicolet Unified Sch. Dist.*, No. 19-CV-425-JPS, 2019 WL 7049803, at *9 (E.D. Wis. Dec. 23, 2019) (hereinafter "*Bonchek*").[3] For the reasons explained herein, the Court will grant Moving Defendants' motion in part as stated herein.

---

[2]In addition to those Defendants included in the caption, the complaint named as Defendants:

- Johnson, sued through his estate;
- School District board members Orren J. Bradley ("Bradley"), William R. Heiser ("Heiser"), and William Huegel ("Huegel"), sued through his estate;
- NHS Administrator James Reiels ("Reiels"), sued through his estate, and staff member Frederick Rice ("Rice").

ECF No. 1. The Court dismissed Johnson, Bradley, Heiser, Huegel, Reiels, and Rice without prejudice from the action after Plaintiffs failed to prove they were served. ECF No. 8.

[3]In *Bonchek*, the Court considered and dismissed nearly identical claims against the same Defendants by a different plaintiff, Mark Bonchek. Plaintiffs' counsel in the instant matter also appeared in *Bonchek* and signed several filings in that action, including Bonchek's opposition to a motion to dismiss. *See Bonchek v. Nicolet Unified Sch. Dist. et al.*, No. 19-CV-425-JPS, ECF No. 29 at 39 (E.D. Wis. Sept. 11, 2019).

## 2. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b) provides for dismissal of complaints which, among other things, fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Olson v. Champaign County*, 784 F.3d 1093, 1099 (7th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is one with "enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Twombly*, 550 U.S. at 556.

In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak*, 810 F.3d at 480–81 (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). At the motion to dismiss stage, the Court does not ask "did these things happen"; instead, "the proper question to ask is . . . '*could* these things have happened.'" *Olson*, 784 F.3d at 1099 (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014)). In any event, the Court "need not accept as true 'legal conclusion[s, or t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements.'" *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Ultimately, dismissal is only appropriate "if it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to the relief requested." *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) (quoting *R.J.R Servs., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1989)).

### 3. RELEVANT ALLEGATIONS[4]

#### 3.1 NHS and Johnson

Johnson was hired by NHS as a math teacher in or around 1958 and worked there until his retirement in 1991. During his tenure, Johnson

---

[4]These allegations are drawn from Plaintiffs' complaint. ECF No. 1. Citations to the complaint are omitted except where material is quoted directly from the complaint. The Court has also considered and cited where relevant the exhibits attached to the complaint, ECF No. 1-1, because those exhibits are referred to throughout the complaint. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (stating that, on a motion to dismiss, "a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint" and "documents that are central to the complaint and are referred to in it").

Despite the Court's clear instruction that "the parties should omit a facts section from their briefing" on a motion to dismiss, ECF No. 2 at 3, Plaintiffs dedicate five pages of their brief in opposition to dismissal to recapping the allegations in the complaint. ECF No. 22 at 10–14. This fact statement has been disregarded for purposes of this Order. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) (emphasizing "a district court's discretion to require strict compliance with its local rules") (citing *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) and *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)).

It bears mentioning that at least two statements in Plaintiffs' facts section in their brief are inconsistent with the complaint and its attachments. *Compare* ECF No. 22 at 11 ("Johnson instructed Cielak to 'play along' to prevent others from finding out [about] the sexual abuse, even though rumors of his behavior circulated." (citing complaint, ¶ 68)) *with* ECF No. 1 at 25 (complaint, ¶ 68 stating

---

chaired NHS's mathematics department, oversaw several school clubs, and was teacher advisor to the "Math Aids," a group of students who assisted NHS math teachers in correcting assignments and exams and preparing lesson plans. NHS—itself considered an elite school—often publicized positive news about Johnson to enhance Johnson's and its own reputations. Johnson was known to be influential, and his recommendations were known to help students attend prestigious colleges.

### 3.2    Joel Cielak

When Cielak was still in eighth grade in 1978, prior to beginning high school at NHS, Johnson contacted his mother and asked her if Cielak would be interested in participating in a physiological "study" Johnson was conducting, noting that Cielak would be compensated for participating and that participation was considered prestigious. Cielak points out that his parents had recently divorced before he began at NHS, which he says made him particularly vulnerable to Johnson's predations.

Once Cielak started at NHS, the "studies" began, occurring approximately weekly after school on Tuesdays or Thursdays at Johnson's apartment. Johnson would transport Cielak to the apartment in his own car. At Johnson's apartment, Johnson would instruct Cielak to put on gym clothes, which Johnson had selected and laid out for Cielak on his bed. Johnson then used safety pins to pin the gym shorts up above Cielak's hips. Johnson then conducted the "study" in his bedroom, ordering Cielak to

---

that "As periodic rumors of Johnson's behavior arose at Nicolet, and [sic] Cielak frequently had to 'play along' so other students wouldn't find out he was one of Johnson's victims. . . ." but not mentioning any instruction by Johnson); *see also infra* note 8 (summarizing discrepancy). At best this suggests Plaintiffs' attorney has taken a cavalier approach toward both court rules and the facts of this case; at worst it suggests willful mischaracterization of the facts in one or both filings.

perform certain "exercises" on him and instructing him to continue until Johnson ejaculated. Johnson used a stopwatch and journal to record the resulting "data."

Johnson eventually chose Cielak to be a Math Aid, which Cielak states was simply another part of Johnson's grooming and exploitation strategy. Johnson would regularly instruct Cielak to work in his office and, during these instances, would touch Cielak's thighs.

In or about the spring of 1980, Cielak told his physical education teacher, Rice, about Johnson's "weird experiments" and about Johnson touching his thighs. Rice responded to Cielak that he had "heard similar stories and . . . would see what he could do." "Upon information and belief, . . . Cielak believed or had reason to believe that . . . Rice[] informed and/or intended to inform the appropriate authorities." ECF No. 1 at 25.

Cielak additionally alleges that another NHS math teacher knew or should have known that Johnson was directing inappropriate attention towards Cielak because, on multiple occasions when Cielak was in that teacher's class, Johnson interrupted the class to request to speak to Cielak in the hallway. Once in the hallway, Johnson would ask Cielak when he would be available to participate in the next "study."

While in high school, Cielak felt terrified that other students, who often joked about rumors of Johnson's abuse, would find out that Cielak was in fact a victim of that abuse.

Johnson's sexual abuse of Cielak continued weekly throughout Cielak's time at NHS until his graduation in 1982. The abuse then continued beyond graduation and up until Cielak was in his twenties. Johnson then continued to contact Cielak into his thirties, referencing the "studies," despite Cielak's demands for Johnson to leave him alone. Johnson

occasionally mailed Cielak checks with memo lines obliquely referencing the "studies."

As a result of the abuse, Cielak has experienced chronic anxiety, stress, paranoia, and anger, and has suffered from Post-Traumatic Stress Disorder (PTSD) which manifests in symptoms such as flashbacks, intrusive thoughts, and altering his behavior to avoid scenarios that might trigger associations with Johnson's abuse. Cielak also alleges that he experienced severe physical injuries as a result of the abuse, lost earnings, and incurred expenses associated with seeking therapy. He states that only through intensive therapy has he been able to realize the full extent of his injuries. He also alleges that NHS's and the School District's 2016–2018 investigation of Johnson (the "2016–2018 Investigation" or the "Investigation"), *see infra* Section 3.5, was incomplete and essentially just a continuation of a district-wide cover-up of Johnson's conduct, and that the fraudulent nature of this investigation has caused him further distress and harm.

### 3.3    Barron Hodges

Hodges attended NHS from 1981 to 1985.[5] Hodges states that, as an African-American student attending NHS through a special program "that allowed city children to attend suburban schools," ECF No. 1 at 30, he was particularly vulnerable to Johnson's predations. Hodges was a driven student and believed Johnson's interest in him was an opportunity to flourish academically.

---

[5]The complaint does not note when Hodges started at NHS, but it states that he attended NHS for "all four years." ECF No. 1 at 31. The Court therefore assumes Hodges was a freshman in the 1981–1982 school year.

Case 2:22-cv-00819-JPS    Filed 09/29/23    Page 7 of 63    Document 33

In the spring of 1983, Hodges was in Johnson's math class.[6] Johnson approached Hodges in the hallway and asked him to participate in a "research project." Johnson explained that Hodges would receive extra credit for participating and that participation was considered prestigious.

Four times throughout that spring semester, at Johnson's instruction, Hodges went to Johnson's apartment. Hodges would put on gym clothes that Johnson had selected and laid out for Hodges on the bed. Then the "studies" would take place in Johnson's living room. Johnson would instruct Hodges to lay his legs perpendicular across Johnson's legs and close to Johnson's genitals. Johnson then instructed Hodges to flutter kick his legs and to start, stop, and continue until Johnson ejaculated.

In the summer of 1983, Hodges participated in the NHS summer school program. One day during the program, Hodges asked to speak alone with one of the summer school teachers with whom he had a close relationship (the "Unnamed Teacher").[7] Hodges then informed the Unnamed Teacher of Johnson's behavior towards him, including that during the "experiments," Johnson required Hodges to make contact with his genitals.

---

[6]The complaint states that Hodges freshman year encompassed the "spring of 1983." *Id.* at 31. However, based on Hodges's graduation date and his attendance at NHS for all four years of high school (both of which are specified in the complaint), either the spring of 1983 must have been Hodges's *sophomore* year, or the complaint misstates the years in which the relevant events unfolded. Because on a motion to dismiss the Court must construe the allegations in the complaint as true, the Court will assume the alleged abuse occurred in 1983 (regardless of what level of high school the complaint says Hodges was in at that time).

[7]The teacher is not named in the complaint. For specificity and ease of reference, the Court will refer to her as the Unnamed Teacher.

Case 2:22-cv-00819-JPS   Filed 09/29/23   Page 8 of 63   Document 33

The Unnamed Teacher, "realizing the rumors were true," *id.* at 33, told Hodges she would take care of the situation. She attempted to relay Hodges's report to the director of the summer school program, who was absent from the school that day; she then attempted to inform Reiels, the administrator of NHS, who was also absent. She then went home and informed her husband of Hodges's report. Her husband contacted the Glendale Police Department ("GPD") and relayed the information. Upon receiving this information, GPD apparently told the Unnamed Teacher to report it to NHS and did not itself formally respond.

Shortly after the Unnamed Teacher contacted GPD, Reiels met with the Unnamed Teacher about the report. Reiels told the Unnamed Teacher that her report risked ruining Johnson's reputation and instructed her not to discuss the matter further. Later, Taxman, a member of the School District board, had lunch with the Unnamed Teacher at Taxman's home. At that lunch, Taxman informed the Unnamed Teacher that she was aware of Hodges's allegation against Johnson, and Taxman told the teacher that the school board had "dealt with this issue." The Unnamed Teacher believed that neither NHS nor GPD would help Hodges and that if she pushed the issue any further, she would lose her job.

When Hodges returned to NHS in the fall of 1983, one school faculty member told him that Johnson would leave him alone, but otherwise no NHS, School District, or GPD representatives followed up with him. The Unnamed Teacher in whom Hodges had initially confided took on a strong protective role towards him, though.

Hodges alleges that he has experienced chronic anxiety, stress, paranoia, anger, and PTSD as a result of the abuse. He alleges that the mental torment stemming from this trauma has rendered him unable to

seek a legal remedy until now. He also alleges that NHS and the School District actively covered up Johnson's abuse, which he learned only after reviewing the findings of the 2016–2018 Investigation. He alleges that the Investigation was incomplete and that its incompleteness evinces that the fraudulent cover-up continues to this day.

### 3.4 The July 1983 Meeting and NHS's Response to Johnson

On or about July 13, 1983—shortly after Hodges confided in the Unnamed Teacher—members of the School District board met in a closed session with Johnson. Plaintiffs allege that NHS staff and/or one or more of the John Doe Defendants may have been present as well. At that time, they addressed recent allegations against Johnson. However, after that meeting, Johnson remained employed at NHS. Johnson's employment was apparently subject to certain conditions and/or close supervision. However, no record of those conditions or supervision has been found. NHS's and the School District's response to the allegations against Johnson were further detailed in the 2016–2018 Investigation.

In October 1983—well after the School District board was made aware of the allegations against him and discussed those allegations in the July 13 meeting—Johnson received the Presidential Award for Excellence in Science and Mathematics Teaching. This was touted in local media as reflecting Johnson's skill and NHS's status as an elite high school. Similarly, Reiels and NHS were lauded in local media throughout the 1980s even after the allegations against Johnson. Plaintiffs argue this is evidence of Defendants' continuing to act to preserve their own reputations rather than remove Johnson.

### 3.5    The 2016–2018 Investigation

In 2016, another individual came forward and reported to NHS that Johnson had abused him.[8] NHS and the School District retained independent legal counsel to investigate the reported abuse.

The Investigation found that the individual who came forward was sexually abused by Johnson in the early 1980s on the NHS campus. The

---

[8]This individual was Mark Bonchek. *Bonchek*, 2019 WL 7049803, at *1. Bonchek alleged that the abuse took place on weekends on campus at NHS beginning in the fall of 1980. *Id.* at *2. Bonchek reported the abuse to NHS in 2016. *Id.*

Plaintiffs represent in their brief in opposition to dismissal that "[t]he Investigator [in the 2016–2018 Investigation] interviewed the former student who initially brought this matter to the District's attention *(Mr. Cielak and Hodges)* . . . ." ECF No. 22 at 13 (emphasis added). But Plaintiffs also state that the student who was interviewed in 2016 was abused by Johnson "*on Nicolet's campus* . . . alone and outside of regular school hours." *Id.* (emphasis added) (citing and quoting ECF No. 1-1 at 102). The complaint alleges that the abuse of Cielak and Hodges took place exclusively *off* campus. ECF No. 1 at 23, 31. So the student who was interviewed as part of the 2016–2018 Investigation was most certainly Bonchek—not Cielak or Hodges, as Plaintiffs imply.

The 2016–2018 Investigation referred to an allegation of on-campus abuse—most likely that of Bonchek—and a separate allegation by a different student who reported "similar misconduct" to an NHS "staff member" "[i]n the early summer of 1983." ECF No. 1-1 at 102–103. As part of the Investigation, "the investigator interviewed[] the former student who initially brought this matter to the District's attention"; the summary of findings differentiate between this student (who alleged he was abused *on* campus) and "a different" student who in the summer of 1983 reported his experience with Johnson to a teacher, who then informed the GPD. *Id.* at 102. This second student was most likely Hodges.

The 2016–2018 Investigation corroborates both Bonchek's and Hodges's abuse and their reporting thereof (and it does not appear to have addressed Johnson's abuse of Cielak). However, it does not appear that Hodges was actually interviewed as part of the 2016–2018 Investigation. To be sure, the body of the complaint does not imply that Hodges was interviewed in the 2016–2018 Investigation. *See* ECF No. 1 at 36, ¶¶ 108–109. Yet Plaintiffs' briefing *does* imply this. ECF No. 22 at 13. This is a relatively minor point, but, again, worth noting as an oversight or mischaracterization by Plaintiffs' counsel. *See also supra* note 4.

nature of the abuse was similar to that of Cielak and Hodges, with Johnson asking this student "to perform physical exercises." ECF No. 1-1 at 102. The Investigation further found that a different student (most likely Hodges) reported "similar misconduct" to a Nicolet staff member (most likely the Unnamed Teacher) in the "early summer of 1983." *Id.*

When Johnson was interviewed during the Investigation about the first student's (Bonchek's) allegation, he "corroborated many of the factual details provided by the former student" but "denied having any contact with any Nicolet student that was sexual in nature." *Id.* Johnson also acknowledged that his "research" or "studies" were independent of his employment with NHS but maintained that they were legitimate. *Id.* The Investigator did not find Johnson's explanation for his conduct to be credible. *Id.*

The Investigation further found that, after the July 13, 1983 meeting, NHS allowed Johnson to remain employed "under certain conditions set forth in a letter from the District Administrator." ECF No. 1-1 at 103 (citing meeting minutes). However, no such letter or record of such conditions has been located in NHS's personnel files or records. *Id.* The Investigation represented that the records were likely lost in a 2010 flood at NHS. *Id.*

The Investigation also stated that "[b]eginning in approximately 1983, Mr. Johnson's [interaction with students in the student organizations he sponsored] [extracurricular interaction with students] was closely supervised by a building administrator," who "did not witness any inappropriate interactions between Mr. Johnson and students." *Id.* (brackets in original). Plaintiffs acknowledge that an NHS staff member was apparently appointed to "supervise" Johnson but contend that no

supervision ever occurred and that the "conditions" that supposedly applied to him were never enforced. ECF No. 1 at 37.

Four of the members of the School District board who were part of the July 13, 1983 meeting were interviewed in the Investigation. ECF No. 1-1 at 103. Two members recalled discussing at that meeting that Johnson made "inappropriate invitations to students to perform physical exercises at [his] home." *Id.* "Only one of these former Board Members, however, recalled Mr. Johnson's conduct being sexual in nature." *Id.* "This former Board member recalled Mr. Johnson being directed to stop engaging in this misconduct" and being "told that failure to follow this directive would result in the termination of his employment[.]" *Id.* The other two members did not recall the session or its subject matter at all. *Id.*

The Investigation also found that "there is evidence" that in the summer of 1983, GPD received the Unnamed Teacher's report of the Hodges incident and that GPD "followed-up with the District Administrator at the time" (most likely Reiels). *Id.* at 102. However, GPD "was unable to locate any records relating to the report made by the staff member, any investigation [GPD] may have conducted, or any information or recommendations shared by [GPD] with the [School] District." *Id.* Reiels has since died so cannot clarify what happened. *Id.* The Investigation corroborates the Unnamed Teacher's memory that Taxman reached out to her, but it provides that Taxman "did not recall any conversations" with the Unnamed Teacher. *Id.*

Finally, the Investigation stated that "[n]one of the individuals who were interviewed were aware of any incidents or misconduct involving Mr. Johnson after 1983." *Id.* at 103.

The results of the Investigation were released to NHS alumni on March 26, 2018, accompanied by a letter from the Superintendent and School Board President which stated "the [School] District at the time clearly should have done much more to protect" NHS students. *Id.* at 99. A few weeks prior, Johnson had been notified by letter of the results of the Investigation and that public records of the Investigation would be released. *Id.* at 57–58. On or about March 28, 2018, just days after NHS released the results of the Investigation, Johnson died by suicide.

4. **ANALYSIS**

Plaintiffs allege fifteen federal and state claims. ECF No. 1 at 46–63. Counts One and Two are claims under 42 U.S.C. § 1983 for violation of Plaintiffs' Fourteenth Amendment due process and equal protection rights, respectively. *Id.* at 46–51. These counts are alleged against all Defendants—a grouping which under the present posture of the case, *see supra* note 2, includes NHS, the School District, Haig, Taxman, and Strauss (again, the "Moving Defendants"), as well as the John Doe Defendants.[9] Haig, Taxman,

---

[9] Plaintiffs have not yet identified the John Doe Defendants. Plaintiffs do not allege that the John Doe Defendants independently engaged in any wrongful conduct; rather, the substantive allegations simply group the John Doe Defendants in with the rest of the named Defendants. *See supra* Section 3.4 and ECF No. 1 at 10, 36–37.

This case was filed on July 18, 2022, and discovery was occurring at least through March 24, 2023. *See* ECF No. 31 (motion for stay of discovery). Plaintiffs have had ample opportunity to identify the John Doe Defendants through discovery but have not done so.

Under these circumstances, the Court sees no basis for any claims to proceed against the still-unidentified John Doe Defendants, nor any reason why the presence of the John Doe Defendants would impede dismissal of this case on Moving Defendants' motion. *See Kennington v. Carter*, 216 F. Supp. 2d 856, 858 (S.D. Ind. 2002) ("Some courts tend to have an eye toward dismissal of unnamed defendants, but afford varying degrees of latitude to plaintiffs attempting to

and Strauss are sued both "individually and in their supervisory capacity." *Id.*[10]

Count Three is a § 1983 claim, apparently pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) ("*Monell*"), for failure to appropriately "hire, train and supervise" employees. Likewise, Count Three is alleged against all Defendants and is operative against Moving Defendants. *Id.* at 51–53. Count Four is a civil conspiracy claim under 42 U.S.C. § 1985 alleged against all Defendants (and operative as to Moving Defendants). *Id.* at 53–54. As above, Haig, Taxman, and Strauss face each of these claims in their individual and supervisory capacities.

The remaining counts allege violations of state law. Counts Five, Six, Seven, and Eight are claims for negligence in Johnson's hiring, retention, and supervision, and negligent failure to warn. *Id.* at 54–57. Counts Nine and Ten are claims for intentional and negligent infliction of emotional distress; Counts Eleven and Twelve allege negligent and intentional

---

discover the true identifies of their alleged injurers. . . . Other courts adamantly permit plaintiffs who claim against unnamed defendants the opportunity to conduct discovery into a defendant's true identity before considering dismissal." (collecting cases)); *see also id.* at 859 (dismissing unnamed defendants because doing so would not prejudice plaintiff—"dismissal of the unnamed officers leaves [plaintiff] with claims identical to those he would have if the officers were maintained"—and the unnamed defendants were not represented by counsel).

[10]Confusingly, Plaintiffs appear to attempt to sue NHS and the School District in an individual and supervisory capacity. Plaintiffs allege each count against two groups of Defendants: those they designate as "Nicolet," a term previously defined in the complaint to include NHS and the School District, and those they designate as the "Nicolet Defendants," previously defined to include NHS and the School District as well as the individual Defendants Bradley, Haig, Huegel, Taxman, Heiser, Strauss, and Reiels. ECF No. 1 at 4, 9, 46. This appears to be an oversight, as NHS and the School District obviously cannot be sued in any capacity except as entities.

misrepresentation against all Defendants; Count Thirteen alleges strict responsibility; Count Fourteen alleges fraud and intentional deceit; and Count Fifteen alleges civil conspiracy. *Id.* at 57–63. Each of Counts Five through Fifteen is alleged against all Defendants and is operative against Moving Defendants; as above, Haig, Taxman, and Strauss face each of these claims in their individual and supervisory capacities.[11]

Moving Defendants request that the Court dismiss all counts in the complaint. ECF No. 12. They argue that the federal constitutional counts do not plausibly state claims for relief and/or are barred by the applicable statute of limitations. *Id.* at 8–26. They also argue that, to the extent the Court retains supplemental jurisdiction if the federal claims are dismissed, the state law claims are barred because Plaintiffs failed to comply with Wisconsin's notice of claim statute, because the statute of limitations has expired, and/or because they do not meet the applicable pleading standard. *Id.* at 26–36. The Court addresses the federal counts first and concludes that they fail to state a claim and will be dismissed with prejudice. The Court

---

[11]As evidenced by the number of counts and the length of the complaint, it is a stretch to characterize it as "short and plain" as required under Federal Rule of Civil Procedure 8, and it would also be a stretch to say its length is justified by any particular factual or legal complexity. Rather, Plaintiffs include a good deal of extraneous detail; for example, Plaintiffs discuss at length the two student organizations Johnson supervised, but they do not allege that either Plaintiff was a member of either organization. The complaint also characterizes Johnson's sexually abusive behavior with language that is increasingly inflammatory, but it is unclear what purpose this serves from a factual standpoint. The presence of such extraneous detail and rhetoric here does not warrant dismissal on its own, but in general it could. *See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, No. 13-CV-3106, 2017 U.S. Dist. LEXIS 198374, at *26–27 (N.D. Ill. Dec. 1, 2017) ("While a minor amount of surplus material in a complaint is not enough to frustrate Rule 8's goals, unnecessary length coupled with repetitiveness, needless complexity, and immaterial allegations are grounds for dismissal.") (citing *Kadamovas v. Stevens*, 706 F.3d 843, 844 (7th Cir. 2013)).

then concludes that exercising supplemental jurisdiction over Plaintiffs' state law claims is inappropriate and, declining to do so, dismisses those claims without prejudice.

Additionally, the Court's pretrial procedures order requires the parties to agree on a set of jury instructions laying out the law applicable to each claim and defense; here, the parties were largely unable to do so. *See* ECF No. 2 at 3, text order dated November 30, 2022, and ECF Nos. 18 and 19. The Court ordered the parties to "submit a single set of proposed joint jury instructions" and further specified that should "the parties wish to argue why their proffered authority supports their proposed jury instruction or the applicable legal standard," they should do so in the motion to dismiss briefing. Text order dated December 14, 2022. The parties' joint submission, clocking in at eighty pages, notes many disputes as to jury instructions. *See generally* ECF No. 21. Plaintiffs did not follow the Court's prompt to raise, in their opposition brief, legal arguments in favor of their proffered jury instructions and legal standards, apparently relying solely on their position statements in the joint submission. In the Court's view, the parties' disputes as to jury instructions reflect both that they disagree, often without good reason as to the governing legal standards and that Plaintiffs' theory of municipal liability is ill-defined. The unwieldiness of the parties' joint submission, coupled with Plaintiffs' having declined to provide any further guidance to the Court in their briefing, have complicated the task of evaluating the proposed jury instructions. The Court has nonetheless attempted to address the parties' material disputes as to jury instructions and the applicable law as relevant throughout this section.

### 4.1 Federal Claims

The Court begins its analysis with a few threshold matters related to the federal claims. Moving Defendants "assume[] the [c]omplaint adequately alleges Johnson violated the constitutional rights of the Plaintiffs by abusing them while they were students." ECF No. 12 at 9 (citing *Bonchek*, 2019 WL 7049803, at *4). As it did in *Bonchek*, the Court will operate under this assumption as well. It is clear that

> a student who alleges he was sexually abused by a public-school official acting under the color of state law has stated a claim under the Fourteenth Amendment. *See Locke v. Hassig*, 788 F.3d 662, 667 (7th Cir. 2015) (sexual abuse by a state actor under color of state law violates the equal protection clause); *Wudtke v. Davel*, 128 F.3d 1057, 1062–64 (7th Cir. 1997) (superintendent's alleged sexual assault of teacher stated substantive due process claim); *Sandra* [*T.E.*] *v. Sperlik*, 639 F. Supp. 2d 912, 921 (N.D. Ill. 2009) ("It goes without saying that the sexual molestation of a student violates that student's substantive due process rights.").

2019 WL 7049803, at *4. Because no party contests that the complaint sufficiently alleges violations by Johnson of Plaintiffs' substantive due process right to bodily integrity and right to equal protection at the time they were students,[12] the Court presumes the same.

Plaintiffs' constitutional claims against all other Defendants are predicated largely on their omissions or inaction in responding to Johnson's violations. As to their substantive due process claim, Plaintiffs allege that Defendants failed to: investigate incidents of abuse when notified of them;

---

[12]The parties do, however, appear to dispute whether Cielak can state a constitutional claim against Moving Defendants based on Johnson sexually abusing Cielak after he graduated. *See* ECF No. 12 at 18–19; *see also* ECF No. 21 at 3–4 (jury instructions including Plaintiffs' proposal to broadly define when Johnson was acting under color of law).

supervise Johnson adequately; "deny him access to young male students," and/or end his employment;[13] "adequately train and supervise the School District employees regarding maintaining, preserving, and protecting students from violations of their right to personal security, bodily integrity, and Equal Protection of the Laws"; and otherwise prevent harm to Plaintiffs and address the "unreasonable risk" Johnson posed to NHS students. ECF No. 1 at 46–48, 51.

Plaintiffs allege that these failures, coupled with Defendants continually promoting Johnson's presence as a feature of NHS's prestigiousness, "encouraged a climate to flourish" where Johnson was able to sexually abuse students. *Id.* at 47. Plaintiffs argue that this led to "further violations of [Plaintiffs'] right to bodily integrity and the right to be free from continued and ongoing sexual molestation, sexual harassment, and inappropriate touching, as well as mental, emotional, and physical abuse." *Id.* at 48.

Similarly, Plaintiffs' equal protection claim turns on the premise that Defendants knew about but failed to act to prevent Johnson's abuse, thus enabling it to continue. In Plaintiffs' view, this "constituted disparate treatment of males and had a disparate impact on [NHS's] young male students." *Id.* at 51.[14]

---

[13]As previously noted, Count Three by its terms alleges a failure to appropriately "hire, train and supervise" employees. ECF No. 1 at 51–53. Plaintiffs make no allegations of any abuse that occurred prior to 1980, let alone any abuse that Defendants knew Johnson committed prior to when he was hired to teach at NHS in 1958. The Court therefore presumes that Plaintiffs do not premise any claim for liability on Defendants' conduct with respect to screening and hiring Johnson.

[14]This single sentence is the full extent of Plaintiffs' allegations as to disparate treatment and impact on the basis of sex. Count Three also references

As noted above, Counts One and Two allege that the conduct of *all* Defendants violated Plaintiffs' rights to bodily integrity and to equal protection of the laws as secured by the Fourteenth Amendment, whereas Count Three alleges a standalone "failure to hire, train and supervise" claim, also against all Defendants. As the Court noted in *Bonchek* (and as Plaintiffs' counsel is presumably well aware), Count Three does not stand on its own as a freestanding cause of action because "[a] failure-to-train theory is simply one way a plaintiff can attempt to hold a municipal entity accountable for causing a constitutional violation inflicted by one of its employees." *Bonchek*, 2019 WL 7049803, at *5 n.3 (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)).

Further, to the extent Count Three is alleged as a *Monell* claim against Haig, Taxman, and Strauss, it is duplicative of the municipal liability claim against NHS and the School District. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. . . . Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." (internal citations and quotation marks omitted)). Because Counts One and Two also allege failures to take action to prevent or address Johnson's abuse, it is

---

violations of "Plaintiffs' . . . right to equal access to an educational environment free from physical, mental, and emotional harassment and discrimination." ECF No. 1 at 52. At one point, Plaintiffs allege that Defendants "violated [their] constitutional right to bodily integrity under the Equal Protection Clause of the Fourteenth Amendment," *id.* at 48, which as far as this Court is aware, is not a right guaranteed under that constitutional provision.

unnecessary for Count Three to be alleged against Haig, Taxman, or Strauss (or any individual for that matter).[15]

In light of the foregoing, the Court adopts the same approach here as it did in *Bonchek*, construing and analyzing Counts One, Two, and Three together as "an allegation of two constitutional violations (due process and equal protection), inflicted by Johnson," for which Plaintiffs seek to hold liable both the individual defendants (here, Haig, Taxman, and Strauss) in their individual and supervisory capacities *and* the relevant municipal entities (NHS and the School District) on one or more theories of *Monell* liability. 2019 WL 7049803, at *5 n.3. Plaintiffs' exact theory (or theories) of *Monell* liability is not readily apparent from the complaint, although the briefing provides some clarification; the Court has attempted to examine each theory it can discern.

With these initial issues addressed, the Court now turns to the substance of Plaintiffs' federal claims against the Moving Defendants. The Court first examines whether Plaintiffs have stated a claim for municipal liability as to NHS and the School District, then examines whether Plaintiffs have stated a claim for individual or supervisory liability as to Haig, Taxman, and Strauss, and then finally addresses Count Four, the civil conspiracy claim. The Court concludes that each claim fails on its merits and must be dismissed with prejudice.

---

[15]Plaintiffs have also alleged Count Three against Johnson himself, which is frankly baffling. How could Johnson possibly be liable for a failure to appropriately hire, train, and supervise himself? The fact that Johnson is included as a defendant as to this count serves as a further example of Plaintiffs' careless and scattershot approach to pleading.

### 4.1.1 Failure to State a Claim—Municipal Liability (Counts One, Two, and Three)

#### 4.1.1.1 Applicable Law and Jury Instructions

Municipal entities may be sued under § 1983 for constitutional deprivations that are attributable to governmental custom or policy. *Monell*, 436 U.S. at 690–91; *see also First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) ("[T]o prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself." (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997))). However, merely employing a constitutional wrongdoer is not sufficient to impose liability on a municipal entity. *LaPorta*, 988 F.3d at 986 ("Municipal liability under *Monell* carries an important limitation: the statute does not incorporate the common-law doctrine of respondeat superior, so a municipality cannot be held liable for the constitutional torts of its employees and agents.") (citing *Monell*, 436 U.S. at 690–91).[16]

To establish a claim of municipal liability, in addition to showing an underlying constitutional violation, a plaintiff must demonstrate (1) a municipal action that amounts to a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

---

[16]This statement is a version of Moving Defendants' proposed instruction. ECF No. 21 at 3, 20–21. Plaintiffs argue such a statement of the law is "inconsistent with the spirit of *Monell*" and propose specifying that municipal defendants "may be held liable under certain circumstances for an employee who has committed a constitutional violation." *Id.* It appears that the parties are essentially talking around the same point, though: a municipality can in some circumstances be held liable for its employee's constitutional wrongdoing, but in no instance can there be municipal *Monell* liability simply by virtue of employing a constitutional wrongdoer. Plaintiffs' proposed instruction is not so much wrong as it is overbroad and imprecise.

official policy";[17] (2) that that "policy or custom demonstrates municipal fault," which "where . . . the plaintiff alleges that the municipality has not directly violated his rights but rather has caused an employee to do so" requires the plaintiff to show that "the municipality's action [or inaction] was taken with deliberate indifference to the plaintiff's constitutional rights"; and (3) causation, that is, that "the municipality's action was the moving force behind the federal-rights violation." *Id.* at 986–87 (quoting *Monell*, 436 U.S. at 694 and *Brown*, 520 U.S. at 404, 407) (internal quotation marks omitted).

There are a number of ways a plaintiff can satisfy the "policy or custom" element of a *Monell* claim. "[T]hree types of municipal actions . . . can support municipal liability under § 1983: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled[18] that it constitutes a custom

---

[17]Plaintiffs propose the following instruction: "Nicolet maintained a policy, custom, or practice . . . *directly or indirectly*," arguing that the italicized phrase is "a clarifying phrase consistent with 7th Circuit precedent that a policy does not have to explicitly favor a constitutional[] injury." ECF No. 21 at 4, 22. This is true as a general matter, but the Court does not see how this proposed instruction clarifies or adds anything not already expressed in the case law cited in this Order. The additional authority Plaintiffs cite, *Pickrel v. City of Springfield*, is of no relevance because it discusses *Monell* only in passing and only to say that no *Monell* claim was ever substantively litigated in the case. 45 F.3d 1115, 1118 & n.1 (7th Cir. 1995). Plaintiffs' proposed instruction is disregarded.

[18]"[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' . . . or even three . . . . But the plaintiff must demonstrate that there is a policy at issue rather than a random event." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988) and citing *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002)); *cf.* ECF No. 21 at 8, 25–26 (agreed-upon jury instructions stating that, to prove a "custom," "[i]t is not enough to demonstrate that policymakers . . . could, or even should, have been aware of the unlawful activity because it occurred more than once. The plaintiff

or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* at 986 (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). Additionally, *Monell* liability can arise on a theory of municipal *in*action, such as a failure to train employees to avoid constitutional violations, because a municipality's "'policy of inaction' in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the [municipality] itself to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Canton,* 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)).

The deliberate indifference element[19] requires that a plaintiff show "that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *LaPorta*, 988 F.3d at 987 (citing *Brown*, 520 U.S. at 407). Stated differently, "the plaintiff must show that [municipal] policymakers were 'deliberately indifferent as to [the] known or obvious consequences'"

---

must demonstrate that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision").

[19]Moving Defendants propose an instruction that delineates deliberate indifference as a specific, standalone element of a *Monell* claim, while Plaintiffs object to the instruction on grounds that such an element "is not a requirement where there is a rule or regulation imposed by the municipality." ECF No. 21 at 9, 26. Plaintiffs are not wrong. *See LaPorta*, 988 F.3d at 986 ("When a municipality takes action or directs an employee to take action that facially violates a federal right, municipal fault is easily established.") (citing *Brown*, 520 U.S. at 404–05). But their opposition is not well taken because it is completely irrelevant to their case—Plaintiffs have not alleged and are not arguing that NHS and the School District had an explicit policy or rule favoring sexual abuse of students. If Plaintiffs' proposed instruction in this regard is intended to argue that the deliberate indifference requirement does not apply to their case, that argument is frivolous bordering on sanctionable.

and were "aware of the risk created by the custom or practice [but] failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303 (quoting and citing *Gable*, 296 F.3d at 537); *see also J.K.J. v. Polk County*, 960 F.3d 367, 379 (7th Cir. 2020) (noting that *Monell* failure-to-train liability only arises if the municipality "has notice that its program will cause constitutional violations") (citing *Connick*, 563 U.S. at 61–62).[20] The causation requirement is likewise "rigorous" and requires the plaintiff to "show a 'direct causal link' between the challenged municipal action and the violation of his constitutional rights." *LaPorta*, 988 F.3d at 986 (quoting *Brown*, 520 U.S. at 404).

---

[20]The Seventh Circuit Pattern Jury Instructions as well as the parties' agreed-upon jury instructions state that policymakers' actual or constructive knowledge of a pattern of constitutional violations might suffice to establish deliberate indifference:

> A persistent and widespread pattern may be a custom even if a municipal defendant has not formally approved it, so long as the plaintiff proves that a policy-making official . . . knew . . . of the pattern and allowed it to continue. This includes a situation where a policy-making official . . . must have known about a subordinate's actions by virtue of the policy-making official's . . . position[,] or a situation in which the activity was so persistent or widespread that the policymaking official should have known about the behavior.

ECF No. 21 at 6–7, 24–25 (drawing from 7th Cir. Pattern Jury Instruction 7.24).

Moving Defendants dispute whether an instruction that Plaintiffs must prove a municipal policymaker "knew . . . *or should have known*" about the alleged pattern of violations is appropriate. *Id.* at 6, 24. But as the above-quoted text indicates, Moving Defendants themselves go on to stipulate that policymaker constructive knowledge can sometimes be an appropriate consideration. *See also Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993) (noting that the deliberate indifference and causation elements "together . . . amount to a requirement that liability be based on a finding that the policymakers have actual *or constructive* notice that a particular omission is likely to result in constitutional violations" (emphasis added)). Moving Defendants' dispute is rejected as immaterial.

Where a plaintiff premises his claim of municipal liability on an alleged policy of inaction, a showing that municipal policymakers[21] were actually or constructively aware of "[a] pattern of similar constitutional violations" . . . is 'ordinarily necessary' to demonstrate deliberate indifference . . . ." *Connick*, 563 U.S. at 62 (citing *Brown*, 520 U.S. at 409). However, in some cases, "a risk of constitutional violations can be so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J.*, 960 F.3d at 380 (citing *Harris*, 489 U.S. 378); *see also* 7th Cir. Pattern Jury Instruction 7.25 (explaining deliberate indifference element as requiring policymaker knowledge of "a pattern of similar constitutional violations" *or* a violation having been "highly predictable even without a pattern of similar constitutional violations").[22]

---

[21]Plaintiffs repeatedly propose in the jury instructions that "policymaker" be defined to include "supervisory personnel." ECF No. 21 at 5–8, 22–25. To support this proposed instruction, Plaintiffs cite *DiDonato v. Panatera*, which is irrelevant because no *Monell* claim was raised in that case, and it does not examine who can be considered a "policymaker" for municipal liability purposes. *See generally* 24 F.4th 1156 (7th Cir. 2022). They also cite *J.K.J.*, which is more on point: there, the Seventh Circuit upheld a jury finding of *Monell* liability, noting in relevant part that "the County was aware of sexual misconduct happening within its jail" because a captain "knew of sexual comments male guards made about female inmates." This knowledge could be imputed to the municipality because that captain "was responsible for creating and implementing the jail's policies and standards." 960 F.3d at 382. However, for the reasons stated below—since Plaintiffs have alleged that Rice, a gym teacher, was the only person who knew about Johnson's abuse of Cielak in 1980, but have not plausibly alleged that Rice was "supervisory personnel" or forwarded Cielak's report to others with supervisory authority—this dispute is immaterial.

[22]The Seventh Circuit has recognized the obvious-risk theory of deliberate indifference for decades. *See, e.g., Deborah O by and through Thomas O v. Lake Cent. Sch. Corp.*, 61 F.3d 905, *2 (7th Cir. 1995) (Table) ("[D]eliberate indifference can be

Notably, "the path to *Monell* liability based on inaction"—irrespective of whether a plaintiff purports to show that municipal policymakers were aware of past constitutional violations or that there was an obvious risk of such violations—"is steeper because . . . a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous[,]" and so "rigorous standards of culpability and causation must be applied . . . ." *J.K.J.*, 960 F.3d at 378 (quoting *Brown*, 520 U.S. at 405).

### 4.1.1.2    Overview of Parties' Arguments

The first challenge the Court faced in deciding this motion was pinning down Plaintiffs' exact theory of municipal liability. Moving Defendants initially construe the complaint as pursuing municipal liability premised on NHS's and the School District's affirmative custom (actively concealing Johnson's abuse of students) *and* custom or policy through inaction (failing to investigate and correct Johnson's abuse of students). ECF No. 12 at 11. Moving Defendants argue that, under either theory, Plaintiffs have insufficiently pleaded the deliberate indifference and causation elements of a *Monell* claim. *Id.*

Specifically, Moving Defendants argue that Plaintiffs' allegations do not establish that any individual who could be considered a policymaker for NHS or the School District was aware of Johnson's misconduct at a time when they could have done something to stop it. *Id.* They concede that NHS

---

shown if, in light of the duties assigned to specific employees, the need for ore or different training is obvious and the inadequacy so likely to result in the violation of constitutional rights . . . [or] where the need is not necessarily obvious, but the pattern or frequency of constitutional violations would put the entity on notice that its' employees to a recurring situation are insufficient to protect the constitutional rights involved." (citing *Canton*, 489 U.S. at 390 & n.10)).

and the District's awareness of Johnson's misconduct began in the summer of 1983, after Hodges reported to the Unnamed Teacher and the School District board was subsequently notified. *Id.* at 12, 15. But, they argue, any allegation of awareness rooted in Cielak's 1980 report to Rice is insufficient to demonstrate that any School District *policymaker* had awareness of Johnson's conduct at any point prior to the summer of 1983. *Id.* at 12; *see also* ECF No. 29 at 8 (reply brief noting that the complaint does not allege that "the physical education teacher [Rice] exercised any supervisory authority over Johnson or was a policymaking official"). Accordingly, Moving Defendants argue, NHS and School District policymakers could not possibly have acted, or failed to act, with respect to a risk of which they were unaware, and so Plaintiffs' claims against NHS and the School District fail on both the deliberate indifference and the causation prongs of the municipal liability analysis. ECF No. 12 at 13–14.

To the extent the two theories of liability need be distinguished, *see Connick*, 563 U.S. at 61, it appears that Plaintiffs are primarily pursuing a theory of liability through a policy of inaction or omission—either a failure to adequately respond to Johnson's abuse, or to train other personnel to recognize respond to it[23]—rather than affirmative custom. *See* ECF No. 22

---

[23]Indeed, the exact nature of Moving Defendants' alleged inaction or omission takes multiple forms in the complaint. The complaint alleges that Defendants failed to act with respect to Johnson himself, alleging that they "ignored and refused to prevent Johnson's molestation," "failed to terminate his employment," and failed to adequately investigate, discipline, train, and supervise Johnson (in addition to alleging that Defendants actively concealed Johnson's abuse). ECF No. 1 at 47, 50. It then alleges that Defendants are liable due to the lack of a timely response to reports of abuse: according to Plaintiffs, Defendants "had unconstitutional customs, policies, practices, and/or procedures of [] failing to investigate criminal and tortious misconduct against [NHS] students" and "refus[ed] and fail[ed] to take immediate and appropriate action to investigate,

at 16 ("A municipality has notice of [sic] a constitutional violation will occur when there is a prior pattern of similar constitutional violations, or when the risk of such violation is so obvious that it compels a municipality to act." (citations omitted); 17 (referencing "a widespread practice of ignoring Johnson's misconduct"), 18 (referencing "inaction" after Cielak's report to Rice as well as Defendants' "fail[ure] to provide adequate training and supervision over an obvious risk of constitutional injury" and failure "to provide supervision or training to its teachers to identify abuse or how to report it"), 19 (referencing the "lack of training" of the Unnamed Teacher

_____

prevent, and/or otherwise protect students within [Defendants'] care from sexual abuse . . . and . . . to take prompt and effective steps to end the sexual abuse, prevent its recurrence, and address its effects." *Id.* at 51–52. Finally, the complaint alleges that Defendants are liable for their failure to train *other* employees (besides Johnson) on how to appropriately respond to suspected or reported abuse. *Id.* at 51 (alleging Defendants "had unconstitutional customs, policies, practices, and/or procedures of . . . failing to adequately train and supervise the School District employees regarding maintaining, preserving, and protecting students from [constitutional] violations . . . ."); *see also id.* at 53 (alleging "fail[ure] to properly hire, train and supervise its employees under by [sic] federal law and the U.S. Constitution").

Plaintiffs' brief in opposition to the motion to dismiss relies primarily on the third theory described above: NHS and the School District's failure to train employees (besides Johnson) on how to appropriately respond to suspected or reported abuse. *See* ECF No. 22 at 18–19 (alleging that Defendants can be held liable "because they failed to provide inadequate [sic] training and supervision over an obvious risk of constitutional injury" and "cannot demonstrate any willingness to provide supervision or training to its teachers to identify abuse or how to report it," and further arguing that Rice's response to Cielak's report suggests he "was not adequately trained in reporting such abuse"); *id.* at 19 (arguing that Hodges's case "further emphasizes the lack of training [of] the teaching staff" because the Unnamed Teacher "initially went to her husband, who reported the abuse to the police"); *but see id.* at 17 (arguing Moving Defendants are liable due to their "widespread practice of ignoring Johnson's misconduct, as confirmed by permitting him to continue his Nicolet employment").

and the failure to fire Johnson as "cultivating an environment of sexual abuse in the school").

Plaintiffs appear to argue that Moving Defendants' inaction or omission led to Cielak's continued abuse either in spite of an obvious risk of constitutional violations or in spite of policymakers' constructive notice of Cielak's report to Rice, thus satisfying the deliberate indifference element of a *Monell* claim. *See id.* at 18–19 (using both "obvious risk" and "constructive notice" language and citing *J.K.J.*, 960 F.3d at 378, 380, 383, 384). Plaintiffs go on to argue that Moving Defendants were deliberately indifferent to Johnson's abuse of Hodges because Moving Defendants had—by virtue of Cielak's report to Rice—"actual notice" of Johnson's prior abuse, yet failed to do anything to prevent Johnson's further abuse of Hodges. *Id.* at 19; *but see id.* (arguing as to Hodges that "Defendants were on notice to the obvious risk of constitutional injuries that would result in their lack of supervision and training"). Whether Plaintiffs intended to argue in the alternative or are conflating the operative legal theories is anyone's guess. But the Court will engage with each of their asserted grounds for why their complaint does, in fact, sufficiently allege deliberate indifference: first, the obvious risk theory, which would make theirs one of those "rare" cases, *Connick*, 563 U.S. at 64, where the obviousness of the risk excuses them from pleading and proving policymakers had any actual or constructive notice of past constitutional violations, *see J.K.J.*, 960 F.3d at 380 ("even in the absence of a similar prior constitutional violation"); and second, a theory that NHS and School District policymakers *were* actually or constructively aware of Johnson's abusive behavior (via Cielak's report to Rice in 1980) and nonetheless failed to prevent it from continuing.

Moving Defendants' opening brief summarily dispenses with the "obvious risk" theory in a footnote. ECF No. 12 at 12 n.6 ("This is not a case involving a high risk of constitutional violations such that there was an obvious need for training." (citing *J.K.J.*, 960 F.3d at 380–84)). However, in their reply brief, Moving Defendants argue that the "obvious risk" theory articulated in the *J.K.J.* case is inapplicable because, unlike in *J.K.J.*, where a municipality had an affirmative duty to protect female inmates in its custody from sexual misconduct by male correctional staff, a school does not have an affirmative constitutional duty to protect its students. ECF No. 29 at 8 (citing *J.K.J.*, 960 F.3d at 381 and *J.O. v. Alton Comm. Unit Sch. Dist. 11*, 909 F.2d 267, 272–73 (7th Cir. 1990)).

Plaintiffs' *Monell* claims fail under any theory of municipal liability. Their allegations do not demonstrate that any NHS or School District policymaker was aware of Johnson's misconduct prior to summer 1983 such that their actions or failure to act with respect to those violations amounted to deliberate indifference or caused Plaintiffs' injuries. Plaintiffs have also failed to persuade the Court that the obvious-risk theory of liability applies in this case and, in any event, have not made allegations sufficient to demonstrate that municipal policymakers failed to act in spite of an obvious risk of constitutional violations and that such failure caused Plaintiffs' injuries.

### 4.1.1.3    Policymakers' Actual or Constructive Knowledge

Turning to the first of these conclusions: the Court concurs in Moving Defendants' argument that the complaint fails to allege that any NHS or School District policymaker was aware of Johnson's misconduct before Hodges's report in the summer of 1983, and that it accordingly fails

to establish deliberate indifference or causation as to either Plaintiff's injuries while they were students. ECF No. 12 at 11–18.

The complaint alleges that Cielak informed Rice of Johnson's abuse, that Rice said he had "heard similar stories and . . . would see what he could do," and that "[u]pon information and belief, Plaintiff Cielak believed or had reason to believe that Mr. Rice informed and/or intended to inform the appropriate authorities." ECF No. 1 at 25. This is insufficient to show that policymakers for NHS and the School District actually knew of Cielak's report to Rice. It does not allege that Rice *did* inform "the appropriate authorities," nor who that would've been within NHS and the School District and whether *that* person had policymaking authority or instead forwarded the report to someone with such authority.[24] Even accepting these allegations as true, they speak only to what Cielak believed Rice did or intended to do, not what Rice did. Perhaps Plaintiffs' angle is that Cielak's belief is circumstantial evidence of what Rice actually did, but the Court finds these allegations to amount to little more than ambivalent speculation that fails to answer the key question at pleading of who did what. *See Brooks*, 578 F.3d at 581 ("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." (quoting *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007))).

---

[24]Rice has not been served in this action, *see supra* note 2, and it appears that he has been deceased for nearly twenty years. *See Frederick Rice Obituary*, perma.cc/3LE3-DQHD (last visited Sept. 27, 2023). If this case were to proceed, Plaintiffs would have to find another way besides Rice's testimony to prove what Rice did with Cielak's report.

Plaintiffs' apparent argument that Rice himself could be considered a "policymaker" for NHS or the School District, such that his knowledge of Cielak's report would be sufficient to support that the municipal entities had notice of constitutional wrongdoing, is incorrect. Plaintiffs argue that Cielak reported Johnson's abuse "to a[n NHS] employee in a position of authority," referencing Rice. ECF No. 22 at 18. While Rice may have had authority over students, the complaint makes no allegations that would permit the Court to conclude that Rice himself was a "policymaker" for NHS or the School District. It does not allege, for example, that Rice was responsible for making institutional rules, *cf. J.K.J.*, 960 F.3d at 382 (finding that a captain was a municipal policymaker whose knowledge could be imputed to the municipality because he "was responsible for creating and implementing the jail's policies and standards"), or for overseeing other employees (which on its own is not always sufficient, *see e.g.*, *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001) (finding "superior officers and supervisors" were not municipal policymakers)).[25] Rice's personal

_____

[25]Plaintiffs offer no argument in response to Moving Defendants' assertion that "the policymaker for [NHS] and the School District is the school board." ECF No. 12 at 12 (citing Wis. Stat. § 120.12). Although Plaintiffs waived any opposition by failing to respond to this argument, *see Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver." (citations omitted)), it appears to be correct. "A person's status as a final policymaker under § 1983 is a question of state or local law." *Kujawski v. Bd. of Commr's of Bartholomew Cnty.*, 183 F.3d 734, 737 (7th Cir. 1999) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). Wis. Stat. § 120.12 vests "school board[s] of a common or union high school district," like NHS and the School District, with various supervisory tasks including "care, control and management of the property and affairs of the school district" and "exercise[ing] general supervision" over schools. Even if a non-board member such as Reiels were considered a "policymaker" with respect to teacher supervision, training, and hiring and firing decisions (which is not at issue and not briefed), that is not dispositive to the

knowledge of Cielak's report is therefore not sufficient on its own to establish that municipal policymakers were aware of Johnson's abuse.

It would also be inappropriate to impute Rice's knowledge of Cielak's report and "similar stories" about Johnson to municipal policymakers. Moving Defendants cite an out-of-circuit case for the proposition that "imputing the knowledge of lower-level employees like Rice to a municipality violates the principle that a municipality is not vicariously liable for the acts of its employees." ECF No. 12 at 13–14 (citing *Thelma D. ex rel. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 933–34 (8th Cir. 1991)).[26] Although the Court ultimately concurs in Moving Defendants' argument, Moving Defendants gloss over an important part of the *Thelma D.* court's conclusions, which was that lower-level employees' knowledge of constitutional violations may in *some* cases be imputed to municipal policymakers—i.e., constructive, not actual, knowledge by policymakers, paired with failure to act, might suffice to show deliberate indifference—when there is a "persistent and widespread pattern of unconstitutional misconduct." 934 F.2d at 933. In that case, allegations of "five prior incidents" by the same teacher "over a sixteen-year period . . . in a school system with over 4,000 employees" did not comprise such a pattern. *Id.* Importantly, though, that court did not close the constructive notice doorway altogether. *See id.* at 933–34 (explaining that "imputation of constructive knowledge requires a showing that the underlying unconstitutional misconduct was 'so widespread or flagrant that . . . the governing body should have known of [it]'" but concluding that, under the

question of whether *Rice* is a policymaker. It is clear that state law would not designate a teacher in Rice's position as a policymaker.

[26]Plaintiffs, unhelpfully, have not responded to the *Thelma D.* case at all.

facts of the case, policymaker "notice of the prior incidents" was required (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987)).

The Seventh Circuit, too, has indicated that this possibility remains open, at least in theory. *See, e.g.*, *Grieveson v. Anderson*, 538 F.3d 763, 774–75 (7th Cir. 2008) ("[T]here must be some knowledge or an awareness—actual *or imputed*—of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation" (quoting *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) (emphasis added)). Moving Defendants do not engage with this in-circuit authority, though, nor with any authority delineating how many or what kind of incidents might make a problem "persistent and widespread" enough to support an inference of policymaker constructive notice of a problem or to impute a lower-level employee's knowledge of the problem to municipal policymakers.

Moving Defendants' slightly underdeveloped argumentation aside, Plaintiffs have alleged three instances of abuse (Cielak's, Hodges's, and Bonchek's), which, standing alone, are not enough to support a finding that Johnson's abuse was so persistent and widespread that NHS and School District policymakers must or should have known about it. *Cf. id.* (declining to find that four incidents occurring to the same plaintiff constituted a widespread pattern of unconstitutional misconduct); *Thelma D.*, 934 F.2d at 933 (same conclusion in light of five instances of abuse by same teacher over a sixteen-year period); *Gable*, 296 F.3d at 538 (same conclusion in light of three occurrences to separate individuals during four-year class period); *Deborah O*, 61 F.3d at *3 (same conclusion in light of two occurrences to other individuals besides plaintiff).

This is not to say that these cases provide a bright-line minimum number of instances that make for a sufficiently widespread pattern of abuse, but Plaintiffs have not provided any authority supporting a finding that three instances across a four-year period makes for a widespread pattern of which NHS and the School District were constructively aware, and the Court has not independently located any such authority. To the contrary, "[i]t is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enters.*, 834 F.3d 760 (7th Cir. 2016).

Moreover, neither Rice's alleged knowledge of the "stories" of Johnson's abuse—nor the allegation that the Unnamed Teacher, upon hearing Hodges's report, "realiz[ed] the rumors were true," nor the complaint's other vague allegations that "rumors" of Johnson's abuse existed, ECF No. 1 at 25, 33, 36—is sufficient to establish a persistent and widespread pattern of abuse that NHS and School District policymakers must or should have known about it. Each teacher's individual knowledge of a single student's report of abuse, coupled with vague allegations of "rumors" and "stories," do not prove that there were, in fact, many additional instances of abuse forming a widespread pattern.[27] *Cf. Spearman*

---

[27]The complaint alleges that Johnson repeatedly interrupted another teacher's math class and "requested to speak to Cielak in the hallway," at which time Johnson would ask Cielak "when he would be available to participate in the next 'study.'" ECF No. 1 at 26. Plaintiffs go on to state that "[s]uch teacher knew or should have known the inappropriate attention from Defendant Johnson to Plaintiff Cielak was more than a simply student/teacher relationship." *Id.* Even if this other math teacher's awareness was probative of what NHS and School District policymakers knew (which, for the reasons explained in this section, it

Page 36 of 63
Case 2:22-cv-00819-JPS   Filed 09/29/23   Page 36 of 63   Document 33

*v. Elizondo*, 230 F. Supp. 3d 888, 894 (N.D. Ill. 2016) (finding "it [could] plausibly be inferred from the allegations that policymakers were aware of wrongdoing by police officers and had a custom or policy of failing to discipline them" due to (1) mayor's statement on the alleged custom, (2) a past jury finding that there was such a custom, and (3) a statement by an indicted officer that the custom was widespread); *Wells v. City of Chicago*, 896 F. Supp. 2d 725, 738–40 (N.D. Ill. 2012) (rejecting assertion that a "handful of statements" by "several defendants stat[ing] that they treated [plaintiff] the same as other arrestees amounts to evidence that other arrestees were likewise subjected to improperly prolonged detention and thus that the City had a practice of unlawfully detaining arrestees" because the statements were "broad[]" and insufficiently similar to the plaintiff's circumstances).

In the absence of allegations sufficient to support a finding that there was a widespread pattern of abuse rather than isolated incidents, it is not appropriate to impute the knowledge of Rice or other lower-level employees to NHS or School District policymakers. And in the absence of allegations that any NHS or School District policymaker was aware of those stories and rumors, or whether they had any basis in fact—and moreover the absence of allegations sufficient to support a finding that NHS or School District policymakers were aware of Cielak's report to Rice—it is not appropriate to conclude that NHS or School District policymaker was actually or constructively aware of Johnson's abuse. Without awareness of the problem, NHS and the School District "cannot be held liable for

---

isn't), this fact does not straightforwardly indicate that the other math teacher was aware or suspicious of Johnson's wrongdoing.

condoning something they knew nothing about and had no reason to suspect." *Bonchek*, 2019 WL 7049803 at *5; *cf. Thelma D.*, 934 F.2d at 933 ("Hindsight lends an increased and ominous significance to these prior incidents" but "[v]iewed from the time at which they occurred, the alleged incidents are relatively isolated and thus, under *Monell*, are insufficient to give rise to Board liability.").

### 4.1.1.4 Obvious Risk of Violations

This leaves the Court to consider Plaintiffs' other apparent theory of deliberate indifference: that there was such an obvious risk of constitutional violations that Defendants may be liable "even in the absence of a similar prior constitutional violation." *J.K.J.*, 960 F.3d at 380. As earlier noted, Moving Defendants' opening brief quickly dismissed this theory as inapplicable, ECF No. 12 at 12 n.6, and Plaintiffs' opposition brief argues both that the risk was obvious *and* that there were prior instances of abuse of which NHS and the School District should have been aware. ECF No. 22 at 18–19. Plaintiffs further argue that the alleged existence of "rumors" about Johnson's abuse and Rice's statement that he had heard "stories" like Cielak's proves that additional incidents of abuse by Johnson were highly predictable and accordingly proves that there was an obvious risk of constitutional violations if NHS and the School district failed to train their teachers "to identify abuse or how to report it." *Id.*

As noted above, Moving Defendants argue in reply that the case Plaintiffs cite in support of their obvious risk theory, *J.K.J.*, 960 F.3d 367, is distinguishable from this case on its facts. ECF No. 29 at 8–9 ("The delicate setting in *J.K.J.*—female inmates confined in circumstances 'where they depended on male guards for nearly everything in their lives,' 960 F.3d at 381—is absent here."). Moving Defendants further argue than an obvious

risk theory does not apply in this case because whereas in *J.K.J.*, the municipality had an "affirmative duty to protect inmates, . . . no such constitutional duty exists between a school and students.") *Id.* (citing *Alton*, 909 F.2d at 272–73).

This argument seems to respond to Plaintiffs' statement, in the rule statement of their opposition brief, that "[i]n sexual abuse cases, 'to prove a Due Process violation, plaintiffs must show that (1) the execution of [the School District's] policies placed students in danger of molestation by a sexual predator, [*Monell*, 436 U.S. at 694,] or (2) [the School District] knew of the danger and did nothing to rectify it, thus fulfilling *Alton*'s requirement of exercising state power to "render students unable to care for themselves[,]" [*Alton*, 909 F.2d at 272].'" ECF No. 22 at 16–17 (citing *R.S. ex rel. Sims v. Bd. of Sch. Directors of Pub. Sch. of City of Milwaukee*, No. 02-C-0555, 2006 WL 757816, at *7 (E.D. Wis. Mar. 22, 2006) (citations reinserted and typographical errors corrected)). Plaintiffs go on to state that, "under the adopted laws of Wisconsin," "[s]tudents are in what may be viewed as *functional custody* of school authorities . . . ." *Id.* at 17 (citing Wis. Stat. § 118.15 and quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989), *cert denied*, 493 U.S. 1044 (1990)).

Once again it appears that Plaintiffs are conflating the operative legal theories. It is unclear if Plaintiffs are arguing that, specifically *because* they were in the "functional custody" of the state pursuant to state law,[28] they can sustain *Monell* claims against NHS and the School District. If that is their argument, it is incorrect; the Seventh Circuit has handily rejected this

---

[28]The application of Wis. Stat. § 118.15 to Plaintiffs is not briefed, and the Court will not address this issue.

proposition. *See Doe v. Paukstat*, 863 F. Supp. 884, 887 (E.D. Wis. 1994) (rejecting plaintiff's argument that "the District owed her a special 'duty of care' which it violated when it allowed Mr. Paukstat to allegedly sexually molest her. . . . [because] '[w]hatever duty of protection does arise is best left to laws outside the Constitution . . . .'") (citing and quoting *Alton*, 90 F.2d at 272))).

On the other hand, if Plaintiffs are arguing that *Monell* liability may arise under a theory that "the School District . . . promulgated policies which allowed sexual abuse to flourish at [NHS]," *id.*, their position finds some support and some detraction in district court cases in this circuit:

> In *Stoneking*[, 882 F.2d at 730], the court observed that public officials could not be liable for a mere failure to supervise. . . . Nonetheless, the court held that public officials could not continue a policy or practice that condoned or authorized unconstitutional behavior. . . . The court observed that two school officials had discouraged and minimized sexual misconduct by teachers, which encouraged a climate where students were victimized. . . . The Seventh Circuit has neither explicitly adopted nor explicitly rejected the holding in *Stoneking*. . . . Several courts in this district have held that [*Alton*'s] treatment of *Stoneking* amounts to an implicit acceptance of its theory of constitutional liability.

*Sperlik*, 639 F. Supp. 2d at 921–22 (collecting district court cases); *but see Leach v. Evansville-Vanderburgh Sch. Corp.*, No. EV 98-196 C-Y/H, 2000 WL 33309376, at *14 (S.D. Ind. May 30, 2000) ("[T]he Seventh Circuit's decision in *Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996), . . . strongly suggests that the Court has not adopted the pattern and practice theory of liability set forth in *Stoneking*.").

Indeed, Plaintiffs' complaint alleges that NHS and the School District, through its officials, "encouraged a climate to flourish" that

fostered Johnson's sexual abuse of students. ECF No. 1 at 47, 50. These allegations gesture at a *Stoneking*-esque theory of *Monell* liability. Plaintiffs offer no further explanation as to what the *Stoneking* and *Alton* cases mean for their case. Nor do they engage with *Nabozny*, which states that, where a theory of municipal liability "rests on a failure to act," municipal entities cannot be held "liable for adopting a practice of failing to act" where "[u]nder *Alton* . . . the defendants had no duty to act." 92 F.3d at 460. The Court concurs with Defendants that *J.K.J.* is distinguishable from this case, but it is not clear on what principle.

But even if the parties had sufficiently briefed these nuanced legal issues, there would still be no basis for *Monell* liability against NHS and the School District because Plaintiffs have not adequately alleged deliberate indifference to an obvious risk of constitutional violations and have provided no authority showing that it would be appropriate to apply the obvious risk theory of liability in the circumstances of this case. Therefore, the Court cannot conclude that the "execution of [NHS and the School District's] policies placed students in danger of molestation by a sexual predator." *R.S.*, 2006 WL 757816, at *7 (citing *Monell*, 436 U.S. at 694).

As outlined exhaustively *supra* Section 4.1.1.3, Plaintiffs have not pleaded that NHS and School District policymakers "*knew of* the allegations of abuse, but did nothing to address them." *Id.* (emphasis added). Similarly, for purposes of an obvious risk theory of deliberate indifference, Plaintiffs have not pleaded that "sexual harassment or abuse by faculty or staff members [was] so likely to occur at [NHS]," perhaps because "the faculty and staff members at this school [were] inherently predatory," that NHS and the School District were constitutionally required to implement measures "to detect and deal with it." *Deborah O*, 61 F.3d at *3. To be sure,

Plaintiffs have pleaded that Johnson committed at least three sexual assaults in the span of about four years. But this is not enough to show that NHS and School District policymakers had reason to believe that abuse by Johnson or by any other school personnel was inevitable or imminent. Likewise, Plaintiffs have characterized Johnson as a predator, *see supra* note 11, but have not alleged that NHS and School District policymakers were aware of this characterization before Plaintiffs' injuries occurred. The facts that Plaintiffs have alleged do not amount to "red lights flashing," alerting NHS and the School District that any one of its staff might have engaged in unconstitutional misconduct at any time. *J.K.J.*, 960 F.3d at 383.

The Court has no reason to question that students experience an unequal balance of power with their teachers and school personnel, who have a great deal of authority and control over them during school time. It is true that students are vulnerable. However, the Court agrees with Moving Defendants that, whatever vulnerability the teacher-student power dynamic creates, it is of a different species than the extreme power differential between, for example, inmates and correctional officers. *See J.K.J.*, 960 F.3d at 381 (noting that female inmates "depended on male guards for nearly everything in their lives—their safety as well as their access to food, medical care, recreation, and even contact with family members"). Without more concrete allegations that sexual abuse of students by teachers was extremely likely to occur at NHS, the Court cannot conclude that the nature of the student-teacher dynamic on its own created a risk of sexual abuse that was so obvious to NHS and School District policymakers as to compel them to action even in the absence of prior violations.

"[I]t may be that a municipality could fail to train its employees with respect to a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Cornfield*, 991 F.2d at 1327 (citing *Canton*, 489 U.S. at 390 n.10). In those instances, allowing a plaintiff to proceed on municipal liability claims in the absence of past constitutional violations may be appropriate:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, *see Tennessee v. Garner*, 471 U.S. 1 . . . (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

> It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

*Canton*, 489 U.S. at 390 n.10. In contrast, in a case where students challenged being subjected to strip searches at school, "[g]iven the nebulous standards governing student searches, school districts and school district administrators cannot be held accountable on [an obvious risk theory] because the particular constitutional duty at issue is not clear." *Cornfield*, 991 F.2d at 1327.

This case is more like *Cornfield* than the hypothetical described in *Canton*. Plaintiffs have not clearly articulated what NHS employees' particular constitutional duty was (to not sexually abuse students? to intervene in another teacher's sexual abuse of a student? something else?) or the basis of that duty in law. Nor have they articulated that said

constitutional duty (whatever it was) was likely to be "implicated in recurrent situations" such that the failure to train employees on how to properly execute their duty can be characterized as deliberate indifference. *Id.* (citing *Canton*, 489 U.S. at 390 n.10); *see also Connick*, 563 U.S. at 66–67 (finding no obvious risk of constitutional violations likely to stem from "failing to provide prosecutors with formal in-house training about how to obey the law" because prosecutors receive other, prior training through legal education, and are "ethically bound to know what [the law] entails and to perform legal research when they are uncertain").

In sum, based on the analysis in the foregoing two sections, the Court cannot conclude that Plaintiffs have sufficiently pleaded facts showing that they meet the deliberate indifference element to sustain a *Monell* claim against NHS and the School District. They have not sufficiently pleaded that NHS or the School District had actual or constructive knowledge of Johnson's sexual abuse of students: their allegations do not show that Rice made a policymaker for NHS or the School District aware of Cielak's report, nor that Rice himself was a policymaker for NHS or the School District, nor that his knowledge of Cielak's report can be imputed to municipal policymakers. Nor have they sufficiently pleaded that the risk of constitutional violations was otherwise so obvious to NHS and School District policymakers as to compel action.

Plaintiffs contend in the complaint that "[i]n or about the spring of 1980 and the summer of 1983, Defendants were expressly informed of and given actual notice of Johnson's deviant conduct." ECF No. 1 at 15. However, the allegations in the complaint only support a finding that NHS and School District policymakers were expressly informed about Johnson's conduct as of summer 1983, pursuant to Hodges's report. Plaintiffs' self-

serving statement to the contrary, that Defendants were "expressly informed of" a report of Johnson's abuse as early as 1980, is insufficient to show deliberate indifference where the other allegations in the complaint do not corroborate Plaintiffs' assertion. To find otherwise would dilute the "rigorous standards of culpability" that apply in cases like these. *J.K.J.*, 960 F.3d at 378 (citation omitted).[29]

---

[29]The Court pauses to address two other arguments relevant to the key element of deliberate indifference. Moving Defendants briefly argue that Plaintiffs cannot demonstrate that they were deliberately indifferent towards Hodges in particular, because after receiving Hodges's report, the School District board *did* do something. ECF No. 12 at 16 ("[T]he school board confronted Johnson, directed Johnson to stop engaging in the misconduct, and threatened his employment if he did not."). Plaintiffs counter that "with actual notice of Johnson's abuse, Nicolet failed to fire him, showing deliberate indifference . . . ." ECF No. 22 at 19. Neither side has fully developed their argument, but it appears that Moving Defendants are correct that doing *something* about a problem might be enough to defeat a finding of deliberate indifference. *See J.K.J.*, 960 F.3d at 383 (upholding jury finding of deliberate indifference because "Polk Count chose the one unavailable option— doing nothing."). At the very least, Plaintiffs have provided no authority supporting the assertion that the School District, upon learning of Hodges's report, was constitutionally required to *fire* Johnson.

Plaintiffs also appear to argue that Rice's and the Unnamed Teacher's responses to Cielak's and Hodges's reports evince that they were inadequately (or not at all) trained in how to respond to student reports of sexual abuse, thereby demonstrating NHS and the School District's deliberate indifference. ECF No. 22 at 18–19 (referencing Rice "stat[ing] he would 'see what he could do' and the Unnamed Teacher "initially [going] to her husband, who reported the abuse to the police"). First of all, Plaintiffs have mischaracterized what their own complaint says the Unnamed Teacher did. She did not go straight to her husband with the report. The complaint specifies that she initially attempted to report to *two* separate NHS administrators and that neither was present at school that day. ECF No. 1 at 33. But more importantly, Plaintiffs have not alleged that Rice or the Unnamed Teacher responded this way specifically *because* of a lack of training. Indeed, they have not made a clear allegation one way or another as to whether NHS and the School District provided any training to its personnel on responding to reports of abuse.

### 4.1.1.5        Causation

The Court further finds that Plaintiffs also have not pleaded the causation element of their *Monell* claims. As to Hodges, this conclusion is straightforward. NHS and School District policymakers did not know of Johnson's abuse until Hodges made his report in summer 1983. Upon learning of Hodges's report, the School District board took action, and Johnson did not abuse Hodges again. The Court therefore concurs in Moving Defendants' argument that NHS's and the School District's actions cannot be said to have been the moving force behind the violation of Hodges's constitutional rights. ECF No. 12 at 16. Plaintiffs have provided no opposition to Moving Defendants' arguments. That Hodges feels the school entities' response was inadequate, *see supra* note 29, is understandable, but does not support a finding that NHS and the School District, through their action or inaction, caused Johnson to abuse Hodges.

As to Cielak, it is similarly clear that he cannot establish that NHS's and the School District's action or inaction caused Johnson to abuse him while he was a student at NHS, because the school entities did not know about that abuse until after Cielak had graduated. Accordingly, Cielak's municipal liability claims against NHS and the School District for abuse that occurred while he was a student "necessarily fail because the constitutional injuries occurred before the policymakers were aware of Johnson's misconduct." ECF No. 12 at 17. Again, Plaintiffs offer no opposition to Moving Defendants' argument in this respect.

Cielak also alleges that Johnson continued abusing him after he graduated, but Moving Defendants—again, without opposition by Plaintiffs—argue that Cielak cannot hold NHS and the School District liable for this abuse for several reasons. *Id.* at 18–19. First, Moving Defendants

reassert their arguments that school policymakers' awareness of a single instance of abuse (as reported by Hodges in 1983) is not enough to establish a municipal policy or custom of inaction, and that the School District board's response to Hodges's report does not reflect deliberate indifference. *Id.* at 18. Second, they argue that any alleged custom of "failing to protect *students* from Johnson . . . could not have been a moving force behind any abuse of a *non-student* like Cielak, an adult who had already graduated." *Id.* Having found that NHS and the School Board were not aware of any abuse by Johnson until 1983, the Court concurs in these points.

Finally, Moving Defendants argue that Cielak cannot sustain a municipal liability claim, or even an underlying constitutional claim, against any defendant for abuse that happened after he graduated because he has failed to assert facts showing that the post-graduation incidents "occurred due to the use or misuse of Johnson's authority over Cielak" as necessary to plead the "under color of state law" element of a § 1983 claim. *Id.* at 19 (citing *Becerra v. Asher*, 105 F.3d 1042, 1045–48 (5th Cir. 1997)). Once again, Plaintiffs have made absolutely no attempt to defend their apparent position, so the Court finds that they have waived their opposition to dismissal of any claim premised on these facts. *Bonte*, 624 F.3d at 466. It bears mentioning that Moving Defendants have not addressed the complaint's allegations that Johnson continued to reference the "studies"—which Johnson might have represented as affiliated with his role at NHS[30]—

---

[30]For example, although the complaint makes no such allegations with respect to Cielak, it does allege that Johnson told Hodges he would "receive extra credit for his participation" in the "studies," that other students were participating in them, and that Johnson made Hodges wear NHS gym clothes during the "studies." ECF No. 1 at 31–32. These allegations would suggest that Johnson used his authority as an NHS teacher to convince Plaintiffs of the legitimacy of the

in his further contacts to Cielak nor provided in-circuit authority or further explanation as to why this is not considered a "use or misuse" of Johnson's past authority. In any event, Moving Defendants' argument stands to simple reason, and considering Plaintiffs' failure to lodge any opposition, the Court accepts Moving Defendants' position.

In sum, the Court finds that Plaintiffs' allegations do not establish that any action or inaction by NHS and the School District caused either Cielak's or Hodges's injuries. This is so because the instances in which Johnson abused them all predated the School District board having any knowledge of the abuse, and, with respect to Johnson's abuse of Cielak after he graduated, did not occur under color of state law.

### 4.1.2 Failure to State a Claim—Individual or Supervisory Liability (Counts One, Two, and Three)

"For constitutional violations under § 1983, a government official is only liable for his or her own misconduct." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) (quoting *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015) (quotation marks omitted)); *see also George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in the violations are responsible."). To establish supervisory liability for a constitutional violation, the plaintiff must show that supervisors "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). This is a "heavy burden," and neither "mere[] negligen[ce] in failing to

---

"studies"; Johnson's continued allusions to the "studies" after Cielak graduated might similarly be viewed as playing on Johnson's authority as an NHS teacher and the sexual and psychological grip he asserted over Cielak when in that role.

detect and prevent subordinates' misconduct" nor "[g]ross negligence" are enough. *Id.* at 992–93.

"If supervisory liability is predicated on failure to act, the plaintiff must show an 'extremely high degree of culpability.'" *Odogba v. Wis. Dep't of Just.*, 22 F. Supp. 3d 895, 909 (E.D. Wis. 2014) (quoting *Lenard v. Argento*, 699 F.2d 874, 885 (7th Cir. 1983)). A supervisor's "[f]ailure to control [his subordinates] is not actionable at all 'absent a showing that the official either encouraged the specific incident of misconduct or in some way directly participated in it.'" *Id.* at 909–10 (quoting *Lenard*, 699 F.2d at 885).

Moving Defendants highlight that there can be no individual claims against Haig, Taxman, and Strauss because there is no allegation that they directly participated in or directed Johnson's abuse of Plaintiffs. ECF No. 12 at 19. Instead, Moving Defendants argue, any potential claim against Haig, Taxman, and Strauss for their purported role in Johnson's violation of Plaintiffs' constitutional rights may only proceed against them in their supervisory capacities. *Id.* at 20. They argue that any supervisory capacity claim fails because Haig, Taxman, and Strauss did not know about Johnson's violations until they received Hodges's report in the summer of 1983. *Id.* at 20–21. Incorporating their arguments as to municipal liability, they argue that Cielak's 1980 report to Rice does not demonstrate that Haig, Taxman, and Strauss had personal knowledge of Johnson's conduct either while Cielak was still a student at NHS, or in 1983 when Johnson abused Hodges. *Id.* As a result, Moving Defendants argue, Haig, Taxman, and Strauss cannot possibly have condoned, facilitated, or turned a blind eye to any abuse by Johnson that occurred before Hodges's 1983 report. *See id.*

Additionally, as to Cielak's post-graduation abuse, Moving Defendants similarly incorporate their previous arguments that such abuse

did not occur under color of state law and that Hodges's report did not put the School District board or its members "on notice of a pattern of conduct that would alert them that Johnson was abusing a *former* student." *Id.* at 21– 22 (emphasis added). Finally, Moving Defendants point out that Plaintiffs have not alleged that Haig, Taxman, and Strauss had "supervisory authority over Johnson . . . other than [that] imposed on the School Board as a whole." *Id.* at 22 (quoting *Doe v. Claiborne Cnty., Tenn. by and through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 511 (6th Cir. 1996)). Because "a claim against "the school board as a whole is really a municipal liability claim" and Plaintiffs have alleged no contrary facts to weigh against this notion, any supervisory claim must be dismissed as duplicative. *Id.*

Plaintiffs counter with a stream of wholly irrelevant points. ECF No. 22 at 22–25. Citing Wisconsin's indemnification statute, Plaintiffs argue that "[w]hen [Haig, Taxman, and Strauss] chose to disregard Johnson's sexual abuse, they acted within the scope of employment and therefore, in their official capacities, under color of state law." *Id.* at 24 (citing Wis. Stat. § 895.46 and *Martin v. Milwaukee County*, 904 F.3d 544, 550–51 (7th Cir. 2018)). Plaintiffs discuss a number of Wisconsin state court cases, and federal cases applying Wisconsin law, examining "scope of employment" under Wis. Stat. § 895.46. *Id.* at 23–24.[31]

The Court agrees with Moving Defendants. To begin with, Plaintiffs' arguments against dismissal are irrelevant because Plaintiffs bring no

---

[31]As Moving Defendants point out, this is simply a repetition of Plaintiffs' arguments from their opposition brief in *Bonchek*. *See* Case No. 19-CV-425, ECF No. 29 at 22–26. The Court then did not find these arguments worth addressing. *See Bonchek*, 2019 WL 7049803, at *4–5 (considering and dismissing whether defendants could be sued in their supervisory roles but not addressing Wis. Stat. § 895.46 or plaintiff's proffered scope-of-employment case law).

indemnification claim in their complaint, nor do they make any reference to the operative Wisconsin statute therein or otherwise put Defendants on notice that such a claim might arise. *See Twombly*, 550 U.S. at 555 (the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests" (citation omitted)). Moving Defendants have made many arguments for dismissal, but contesting NHS or the School District's responsibility to indemnify the individual Defendants in the event of an adverse judgment is not one of them, and neither is contesting that any Defendant was acting within or outside the scope of his or her employment—again, presumably because Plaintiffs did not plead indemnification. Plaintiffs may not now place the matter of scope of employment at issue and may not use their opposition brief to rewrite the complaint to include an indemnification claim. Moreover, Plaintiffs may not rely on the premise that Haig, Taxman, and Strauss *might* be indemnified under state law to back-door in an official-capacity claim against them. Even if such claim had merit—it does not—it would be duplicative of the *Monell* claims against NHS and the School District and would also circumvent *Monell*'s admonition against respondeat superior liability.

Getting to the merits, the Court accepts Moving Defendants' arguments for dismissal. Obviously, there can be no individual liability as to Haig, Taxman, and Strauss, because they are not alleged to have been directly involved in Johnson's abuse of students. And the allegations in the complaint do not support allowing a supervisory liability claim to proceed against them. The complaint shows that Haig, Taxman, and Strauss, upon being notified in summer 1983 of Johnson's abuse of Hodges, took action against Johnson. Hodges was not abused again, and Defendants did not

have notice that past students such as Cielak might be subject to ongoing abuse by Johnson. These facts do not support a finding that Haig, Taxman, and Strauss each turned a blind eye to the abuse, facilitated it, or otherwise acted with an "extremely high degree of culpability." *Lenard*, 699 F.2d at 885. These claims therefore must be dismissed.

### 4.1.3 Failure to State a Claim (Count Four, Civil Conspiracy)

The purpose of 42 U.S.C. § 1985 is to provide a remedy for conspiracies involving private actors for any violation of the rights designated within the statute. *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971). To plead a violation of § 1985(3),[32] a plaintiff must allege "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." *Brokaw v. Mercer County*, 235 F.3d 1000, 1024 (7th Cir. 2000) (quoting *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996)). To establish that the purpose of the conspiracy is to deprive the plaintiff of equal protection, the plaintiff "must allege 'some . . . class-based invidiously discriminatory animus behind the conspirators' action.'" *Id.* (quoting *Griffin*, 403 U.S. at 102). The statute's coverage extends to "conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty." *Volk v. Coler*, 845 F.2d 1422, 1434 (7th Cir. 1988).

Moving Defendants argue that Plaintiffs' § 1985 conspiracy claim must be dismissed because their allegations do not involve any private

---

[32]Subsections (1) and (2) provide causes of action that are not relevant here.

(non-state) actors, rendering the conspiracy claim duplicative of the §1983 claims. ECF No. 12 at 23. Moving Defendants also argue that Plaintiffs have not shown that Moving Defendants' conduct caused Plaintiffs' injuries, and that Plaintiffs have not alleged that the putative conspiracy was driven by any class-based discriminatory animus. *Id.*

In their opposition brief, Plaintiffs respond to the first argument only insofar as to argue that there *was* a conspiracy, as evidenced by the School District board's response to the Unnamed Teacher's[33] report. ECF No. 22 at 26. They do not respond to the causation argument. They argue that the conspiracy was motivated by discriminatory animus because Johnson harmed only teenage boys, a fact that the 2016–18 Investigation recognized—i.e., "the conspiracy against was them . . . gender-based." *Id.* at 27 (also arguing that the conspiracy was intended to "deprive the Plaintiffs of their equal protection under the law and recognized right of bodily [sic] because of their gender"). They later argue that Plaintiffs' § 1985 conspiracy claim is not superfluous because it requires proof of an element (discriminatory animus) that is not required in a civil conspiracy action under § 1983, and rather is "essential because it highlights the animus motivation behind the Defendants' conduct." *Id.* at 28 (citing *N.R. by Ragan v. Sch. Bd. of Okaloosa Cnty., Fla.*, 418 F. Supp. 3d 957, 998 (N.D. Fla. 2019)). Finally, Plaintiffs dedicate a full page of their brief to an argument that

---

[33]Here, of all places, Plaintiffs provide, for the first time, the Unnamed Teacher's name. ECF No. 22 at 26. Why did they choose to specify her name in this one place and nowhere else? The Court will never know.

Moving Defendants did not raise (that the § 1985 claim is barred by the "intracorporate conspiracy doctrine"). *Id.*[34]

The Court agrees that Plaintiffs' allegations exclusively involve state actors, rendering this claim duplicative of their § 1983 claims. *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009) (because "the function of § 1985(3) is to permit recovery from a private actor who has conspired with state actors," a claim under § 1985 involving only state actors "does not add anything except needless complexity" and is "superfluous" of a § 1983 claim) (citing *Dennis v. Sparks*, 449 U.S. 24 (1980) and *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). Likewise, Plaintiffs' assertion that their § 1985 conspiracy claim is not superfluous and instead is necessary to raise a theory of discriminatory animus that they cannot raise through a § 1983 civil conspiracy claim is off base because they have not attempted to raise a § 1983 civil conspiracy in the first place. *See N.R.*, 418 F. Supp. 2d at 998–99 (explaining the differences between civil conspiracy claims under §1983 and §1985(3)). Why would Plaintiffs need an alternative vehicle to raise a claim they did not bring in the complaint? Second, for the reasons discussed ad nauseam above, Plaintiffs have not and cannot allege that Moving Defendants' conduct upon receiving Hodges's report caused either Cielak's or Hodges's injuries. This pleading deficiency also dooms the § 1985 claim.

Finally, Plaintiffs have not adequately alleged that Moving Defendants' conduct evinces gender-based discriminatory animus. Any allegations that might go to this point—those raised in support of Plaintiffs' equal protection claim—are mere conclusory recitations of legal concepts

---

[34]At this point, the Court has to wonder how Plaintiffs' opposition brief spans the full thirty-page limit allowable under local rules, and yet says so little of substance in response to Moving Defendants' actual arguments.

like "disparate treatment" and "disparate impact," devoid of any actual discussion of how the treatment of Plaintiffs differed from that of female students or any other group. *See supra* note 14. And while perhaps there is a colorable argument that *Johnson's* conduct evinced a discriminatory animus because it was directed exclusively at young male students, that is somewhat beside the point. A § 1985 claim requires a showing that there was "invidiously discriminatory animus behind the *conspirators'* action." *Brokaw*, 235 F.3d at 1024 (emphasis added). Plaintiffs' conclusory allegations that there was disparate treatment or impact of male students show no such animus from Moving Defendants.

### 4.1.4 Statute of Limitations (Counts One through Four)

Sections 1983 and 1985 do not have their own limitations periods; instead, courts turn to the personal injury statute of limitations in the state where the injury occurred. *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993) (citing *Wilson v. Garcia*, 471 U.S. 261, 280 (1985)) (Section 1983); *Wilson v. Giesen*, 956 F.2d 738, 741 n.4 (7th Cir. 1992) (citing *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 79 (3d Cir. 1989) *and Kness v. Grimm*, 761 F. Supp. 513, 519 (N.D. Ill. 1990)) (Section 1985). For claims accrued in Wisconsin, the six-year statute of limitation contained in Wis. Stat. § 893.53 applies to federal civil rights claims. *Gray v. Lacke*, 885 F.2d 399, 409 (7th Cir. 1989).[35]

----

[35]In April 2018, Wisconsin amended this statute to provide a three-year statute of limitations. However, "the controlling statutory limitation period is the one in effect when the claim for relief accrued." *John Doe 1 v. Archdiocese of Milwaukee*, 734 N.W.2d 827, ¶ 15 (Wis. 2007) (citing *Betthauser v. Med. Protective Co.*, 493 N.W.2d 40 (1990)). Plaintiffs walk a tightrope of neither disputing nor conceding that their claims for relief accrued before April 2018 (which makes sense, as arguing that their claims did not accrue until after April 2018 would trigger a shorted limitations period), while also arguing that their claims are not time-barred on other grounds. To give Plaintiffs the benefit of the doubt, the Court

For a plaintiff whose claim accrued while he was under the age of 18, the statute of limitations is tolled until two years after the plaintiff turns 18, unless that period is shorter than the otherwise applicable limit. Wis. Stat. § 893.16.

While state law supplies the applicable statute of limitations, "the time at which a § 1983 claim accrues 'is a question of federal law,' 'conforming in general to common-law tort principles.'" *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). The accrual date is "presumptively 'when the plaintiff has a complete and present cause of action.'" *Id.*; *see also Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 801–02 (7th Cir. 2008) (a civil rights claim begins accruing from the date the plaintiff knew or should have known that he sustained an injury).

As reflected in the parties' proposed jury instructions, Moving Defendants submit that Plaintiffs' allegations must show that their § 1983 and § 1985 claims accrued before July 18, 2016—six years before the date the complaint was filed in this case—in order to survive a statute of limitations challenge. ECF No. 21 at 10. Moving Defendants argue that Plaintiffs' federal civil rights claims are time-barred because Plaintiffs "knew or had reason to know of the facts underlying [their] current civil rights claims in the 1980s." ECF No. 12 at 24 (quoting *Bonchek*, 2019 WL 7049803, at *9). Moving Defendants argue this is so because the allegations in the complaint show that both Plaintiffs experienced psychological distress at the time the abuse happened and, in fact, told someone what

---

will assume the six-year limitations period applicable to claims accruing before April 2018 applies.

happened to them because they knew it was wrong. *Id.* at 25–26. Accordingly, these plaintiffs "had enough knowledge that, 'coupled with a reasonably diligent investigation,' could have led to the discovery of" their injuries, so their injuries should be considered accrued as of the 1980s—well before the July 2016 cutoff. *Id.* at 25 (quoting *Bonchek*, 2019 WL 7049803, at *9). Moving Defendants frame Plaintiffs' injury as "Defendants [having] failed to protect the Plaintiffs from a known predator and continued to tout Johnson to the community notwithstanding the Defendants' knowledge of Johnson's abusive behavior." *Id.* at 24; *cf. Paukstat*, 863 F. Supp. at 892 (similarly framing injury arising from *Monell* claim as "the School District's promulgation of a policy that allowed sexual abuse to flourish").

Plaintiffs once again provide very little in the way of argumentation, but somehow, they manage to do enough to throw off Moving Defendants' statute of limitations defense. Their opposition brief explains the discovery rule and the doctrine of equitable tolling. ECF No. 22 at 20–22. In the joint proposed jury instructions, Plaintiffs argue that the date of accrual is "a date that you, and only you [the jury], may find." ECF No. 21 at 10. Their opposition brief further argues for this formulation of the law, contending that "[d]etermining the point under the discovery rule at which the running of the limitations period commences is a question for the trier of fact, unless the parties do not dispute the facts and only one conclusion may be drawn from them." ECF No. 22 at 20 (citing *Paukstat*, 863 F. Supp. at 892). Then, in a single paragraph with no citation to authority, they argue that both the discovery rule and equitable tolling apply to allow their § 1983 claims to proceed. ECF No. 22 at 22 ("The two required elements for equitable tolling—diligent pursuit and extraordinary circumstances—are clearly present here. A plaintiff only needs to show that a reasonable person, in his

situation, would have acted in a comparable way. Sexual abuse is considered an 'extraordinary circumstance.'").[36]

Moving Defendants have not responded to Plaintiffs' (severely underdeveloped) argument that accrual under the discovery rule is almost always "a question for the trier of fact" and that, here, a trier of fact must decide whether "a reasonable person, in [Plaintiffs'] situation, would have acted in a comparable way." *Cf. Paukstat*, 863 F. Supp. at 892 ("It is not clear to me, as a matter of law, when a reasonable person in Ms. Doe's shoes would have realized that one of her constitutional rights had been violated by the School District . . . . Indeed, Ms. Doe says she only uncovered certain documents regarding alleged prior misbehavior of Mr. Paustat after she began discovery in [this case]."). They have not argued that "the parties do not dispute the facts [relevant to Plaintiffs' discovery of their injuries] and only one conclusion may be drawn from them." *Id.*

Unfortunately, because both parties have failed to brief these issues, the Court must decline to find one way or another. The statute of limitations defense is ultimately moot in light of the Court's finding that the underlying federal civil rights claims are without merit. However, if those claims did have merit, the issue of when Plaintiffs discovered their injuries might be

---

[36]Plaintiffs additionally argue that their § 1985 conspiracy claim is not time-barred under the so-called "continuing violation doctrine," whereby the limitations period for such a claim "begins to run from each overt act of the conspiracy causing damage." ECF No. 22 at 25–26 (quoting *Dakay v. Sch. Dist. of Cheltenham Twp.*, No. CIV.A. 86-3386, 1987 WL 17367, at *3 (E.D. Pa. Sept. 23, 1987)). Finally, they argue that the Court should apply equitable estoppel to prevent Defendants from benefiting from the statute of limitations where they have engaged in "bad acts." *Id.* at 37 (citing *Hester v. Williams*, 345 N.W.2d, 426, 431 (Wis. 1984) *and Schauer v. Diocese of Green Bay*, 687 N.W.2d 766, 771–72 (Wis. Ct. App. 2004)). They provide no explanation for how the law they cite on either point applies to the facts of this case.

one for the jury. At the very least, it would be premature for the Court, on a motion to dismiss, to determine that there is no dispute of fact or of inference based on the facts in the complaint.

Plaintiffs have alleged, inter alia, that they required decades of "intensive therapy" to "bec[o]me fully aware that many of [their] injuries were the result of Johnson's abuse and the Defendant's [sic] subsequent cover-up." ECF No. 1 at 28; *see also id.* at 41–42 (alleging that Hodges' PTSD rendered him "unable to seek an adequate legal remedy," that he required "years of therapeutic treatment" before being able to come forward, and that he "only learned of the school's active role in his continual mental trauma" after NHS released the findings of the 2016–2018 Investigation). While Moving Defendants' argument that Plaintiffs discovered their injuries shortly after the instances of abuse makes more intuitive sense than Plaintiffs' argument that full discovery took decades, it still leaves open the question of when full discovery did occur. The Court will not make either party's points for them but on the thin record before it, cannot adopt Moving Defendants' arguments that the claims are time-barred. Therefore, the Court will not address further the statute of limitations defense or the parties' arguments thereon.

In conclusion, because each of Counts One, Two, Three, and Four fails to state a claim, these counts will be dismissed with prejudice as against NHS, the School District, Haig, Taxman, and Strauss, and will stand dismissed without prejudice as against all the other Defendants who were not served. ECF No. 8.

### 4.2 State Law Claims

The remaining counts allege violations of state law. Moving Defendants ask the Court to retain supplemental jurisdiction over these

claims in order to dismiss them on the merits, and lay out various arguments for merits dismissal. ECF No. 12 at 26–36. Plaintiffs respond to those merits arguments. ECF No. 22 at 29–39. They contend, among other things, that the Court should adopt an opinion expressed in the dissent of a Wisconsin Supreme Court decision, *id.* at 30–32 (citing *Archdiocese of Milwaukee*, 734 N.W.2d 827), and that "public policy requires a reconsideration of decades-old Wisconsin decisions" requiring dismissal under the statute of limitations. *Id.* at 39.

In general, "if the federal claims drop out *before trial,* the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007) (citing *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999)). "Substantial judicial and party resources will probably not have been expended on the litigation, and so the economies from retaining jurisdiction over the state-law claims will be slight." *Id.* Declining to exercise supplemental jurisdiction may be appropriate where a state law claim "raises a novel or complex issue of [s]tate law." 28 U.S.C. § 1367(c)(1). On the other hand, if the Court determines that a state law claim is "clearly without merit, it invades no state interest—on the contrary, it spares overburdened state courts additional work that they do not want or need—for the federal court to dismiss the claim on the merits rather than invite a further, and futile, round of litigation in the state courts." *Carlson v. City of Delafield*, 779 F. Supp. 2d 928, 945 (E.D. Wis. 2011) (quoting *In re Repository Techs., Inc.*, 601 F.3d 710, 725 (7th Cir. 2010)).

The Court appreciates that Moving Defendants have taken time and care to lay out opposition to Plaintiffs' state law claims. However, because the claims over which the Court has original jurisdiction have been

eliminated, the Court finds it prudent to decline to exercise supplemental jurisdiction as to the remaining state law claims. While the state of Plaintiffs' briefing raises skepticism as to whether their arguments for changes in state law have any legs, it should be the Wisconsin courts, not this one, that get the first crack at determining whether to reexamine state precedent.

Plaintiffs' state law claims accordingly will be dismissed without prejudice. *Lauderdale-El v. Ind. Parole Bd.*, 35 F.4th 572, 576 (7th Cir. 2022) ("Dismissals for lack of subject-matter jurisdiction are necessarily without prejudice . . . ." (citing *Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 639 (7th Cir. 2021))).

### 4.3    Leave to Amend

Plaintiffs request that, upon a finding that their pleadings are deficient, they be granted leave to amend their complaint. ECF No. 22 at 39. The Court will not grant Plaintiffs' request. Plaintiffs have failed to submit a sufficient pleading after they (1) were put on notice of many of the same pleading deficiencies more than three years ago in *Bonchek*, and (2) failed to cure pleading deficiencies through the Court's required meet-and-confer process. ECF No. 2–4. Plaintiffs have evinced through their course of conduct in this and the *Bonchek* actions that they do not take the Court's directives seriously. Under these circumstances, granting Plaintiffs leave to amend would be futile and in any case is inappropriate. *See Sound of Music Co. v. 3M*, 477 F.3d 910, 923 (7th Cir. 2007) ("If the amended claim would not survive a motion for summary judgment, the amendment is futile.") (citing *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 861 (7th Cir. 2001)).

5.      **CONCLUSION**

At the end of the day, what happened to Plaintiffs was wrong, and it should not be tolerated. The Court concurs in the basic moral and ethical assumptions of Plaintiffs' lawsuit: that no person should have to endure the abuse they experienced, and that those vested with the authority to address sexual abuse should exercise such authority or suffer the consequences for failing to do so. But Plaintiffs have put forth no compelling *legal* argument that their federal claims should proceed. Indeed, although the Court makes no finding as to the operation of the statute of limitation on Plaintiffs' federal claims, Moving Defendants' arguments for dismissal illustrate the purpose of those statutes: to "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick*, 444 U.S. 111, 117 (1979) (collecting cases). Where insufficient federal claims are coupled with the above-stated issues, making it unlikely that the parties or the Court can ever get a comprehensive picture of what actually happened, the correct legal result is dismissal.

Accordingly,

**IT IS ORDERED** that Defendants Nicolet Unified School District, Nicolet High School, Gerald T. Haig, Myra Taxman, and Robert Strauss's motion to dismiss, ECF No. 11, be and the same hereby is **GRANTED in part** as stated in this Order;

**IT IS FURTHER ORDERED** that Plaintiff Joel Cielak and Barron Hodge's federal civil rights claims, Counts One, Two, Three, and Four in the complaint, ECF No. 1, be and the same hereby are **DISMISSED with prejudice**;

Case 2:22-cv-00819-JPS   Filed 09/29/23   Page 62 of 63   Document 33

**IT IS FURTHER ORDERED** that, the Court having declined to exercise supplemental jurisdiction over Plaintiff Joel Cielak and Barron Hodge's state law claims, Counts Five, Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen in the complaint, ECF No. 1, those claims be and the same hereby are **DISMISSED without prejudice**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED.**

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2023.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge